# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FREDERICK BANKS**, | : | CIVIL ACTION NO. 1:06-CV-1127 |
| Plaintiff | : | |
| | : | (Judge Conner) |
| v. | : | |
| | : | |
| **JULIE NICLKIN, et al.**, | : | |
| | : | |
| Defendants | : | |

## MEMORANDUM

Plaintiff Frederick Banks ("Banks"), a federal inmate formerly incarcerated at the Canaan Federal Prison Camp in Waymart, Pennsylvania, is proceeding with this civil rights action *via* an amended complaint. (Doc. 38.) Defendants are seeking an entry of summary judgment on the following remaining claims[1]: (1) a First Amendment claim of retaliation; (2) a Fourth Amendment claim of invasion of privacy; and (3) Eighth Amendment claims alleging that Banks' cell conditions were

---

[1] By prior memorandum and order defendants' motion to dismiss or, in the alternative, for summary judgment, was granted in part and denied in part as follows: (a) all claims against the unknown defendants were dismissed; (b) all Bivens claims against the Federal Bureau of Prisons and United States were dismissed; (c) the conspiracy claims brought pursuant to 42 U.S.C. § 1985 and all Bivens equal protection claims were dismissed; (d) summary judgment was entered in favor of defendants with respect to all claims pursuant to the Federal Tort Claims Act, all Bivens claims that accrued during or after the May 29, 2006 meeting, all Bivens claims relating to the denial of access to religious materials and to plaintiff's prison work status, and all Bivens claims that accrued on or after May 6, 2006. (Doc. 59, at 37-38.) Entry of judgment was deferred. (Id.) By memorandum and order dated August 10, 2009, summary judgment was granted in defendants' favor with respect to Banks' First Amendment access to the court's claim. (Doc. 78, at 16.) Entry of judgment was again deferred. (Id.)

substandard, that he was denied adequate medical care, and that he was denied adequate recreation time. (Doc. 117). For the reasons that follow, defendants' motion for summary judgment will be granted.

I.     **Statement of Facts**[2]

Because this is the third motion for summary judgment addressed by the court, the recitation of facts will be limited to those relevant to the remaining claims.

   A.     First Amendment[3]

Banks claims that defendant Lappin maintained a de facto policy of motivating defendants Lindsey, Nicklin, Renda, and Roberts, to punish inmates for filing grievances. (Doc. 38, at ¶¶ 9, 11.) Defendant Lappin is the Director of the Federal Bureau of Prisons ("BOP"). (Id. at ¶ 33) He works in the BOP's Central Office in Washington, D.C. (Id. at ¶ 34.) Defendant Lindsey was the warden at USP-Canaan from May 16, 2004, through April 29, 2007, and was responsible for the administrative and organizational control of the institution. (Doc. 125, at ¶¶ 25-26.) Defendant Nicklin was employed as the Satellite Operations Administrator at USP

---

[2] Given the applicable standard of review for a motion for summary judgment, the facts will be presented in the light most favorable to Banks, who is the non-movant. See infra Part II.

[3] Defendants seek judgment on Banks' claim that he was transferred to the SHU on July 12, 2006, and subsequently transferred to another facility in retaliation for filing grievances. This claim clearly accrued during or after the May 29, 2006 meeting referenced in the amended complaint (Doc. 38, ¶¶ 3-6), and the court squarely disposed of it by prior order (Doc. 59, at 38, ¶ 1(d)). It will not be revisited.

2

Canaan's satellite camp from August 22, 2004, through December 6, 2008. (Id. at ¶¶ 28-29.) Defendant Renda was employed as a case manager at USP-Canaan's satellite camp from September 4, 2004, through January 7, 2007. (Id. at 23-24.) Defendant Roberts is a correctional counselor who is responsible for institution security, inmate conduct and discipline, and control of contraband. (Id. at ¶¶, 31-32.) He is also required to provide oral and written reports concerning the behavior and progress of inmates. (Id. at ¶ 32.)

Banks stated in his deposition testimony that his efforts to file requests for administrative relief or any other grievances commenced after he left the Special Housing Unit on May 6, 2006. (Id. at ¶ 41.) Defendants Lindsey, Nicklin, Renda, and Roberts declared that they have no knowledge of a de facto retaliation policy established by Mr. Lappin. (Id. at ¶ 43.)

B. Fourth Amendment

Banks alleges that his expectation of privacy was infringed upon when defendants Nicklin, Renda, and Roberts read his legal and personal mail.

BOP policy, as codified at 28 C.F.R. 540.14, permits, and in some instances requires, BOP staff to open and inspect inmate general correspondence. (Doc. 125, at ¶ 46.) Defendant Lindsay was not involved in the daily screening of inmate mail. (Id. at ¶ 49.) Defendants Nicklin, Renda and Roberts state that they did not open, read or copy inmate outgoing or incoming mail or improperly handle Banks' "special mail." (Id. at ¶¶ 44, 47-48.)

3

Conversely, Banks testified at his deposition that defendants made the following admission:

> Q. Okay. And did they each admit – all four of these defendants admit that they were reading you legal mail?
>
> A. I believe so. I believe I asked, and they acted like, you know, We can do it. It's like they were under the impression that they can do it.
>
> Q. Well, but did they tell you that they were reading your legal mail?
>
> A. Yea.
>
> Q. All four of them.
>
> A. That's the impression I got.

(Doc. 124-5, at 9.)

### C. Eighth Amendment

#### 1. *Inadequate Cell Conditions*

Banks alleges that his cell was filled with "mites and must" from an air vent which was never cleaned. (Doc. 38, at ¶ 27.) He avers that the conditions caused him to cough and chronically choke on his vomit and gag. (Id.)

Defendant Bender was assigned to USP Canaan and worked the SHU morning shift as an SHU Range #1 Officer during the time period of April 17, 2006, through May 3, 2006. (Doc. 125, ¶ 51.) Defendant Hess was employed as a lieutenant at USP-Canaan from February 20, 2005, through January 6, 2008. (Id. at ¶¶ 55-56.)

Maintenance at USP Canaan is handled by staff in the Mechanical Services Department. (Id. at ¶ 76.) According to the facilities manager/safety, during the first quarter of 2006, preventative maintenance of the institution's air ventilation system, which involved checking belts and changing filters as needed, was completed on a monthly basis. (Id. at ¶ 77.) After April 2006, preventative maintenance was performed on a quarterly basis. (Id. at ¶ 79.)

Cleaning supplies such as a broom and dust pan, glass cleaner, all purpose cleaner, and paper towels were offered to SHU inmates twice a week. (Doc. 125, at ¶ 80). All were suitable to clean the air vent covers, and inmates in the SHU were able to reach the air vent covers located in their cells. (Id. at ¶ 81.)

Neither Bender nor Hess recall Banks raising a concern over the cleanliness of his cell or the air vents. (Id. at ¶ 82.) If such complaints were raised, they would have been forwarded to the Mechanical Services Department.

Upon his release from the SHU, he did not seek medical attention for any adverse conditions attributable to poor cell conditions. (Id. at ¶ 84.) On May 10, 2006, he was given a physical and no breathing or other physical problems were present. (Id. at ¶ 85.)

### 2. *Deprivation of Recreation*

Banks alleges that defendants Bender and Hess denied him recreation while housed in the SHU from April 17, 2006, to May 3, 2006. At the relevant time period, inmates in the SHU at USP Canaan were offered five hours of recreation per week. (Doc. 125, at ¶ 68.) Defendants Bender and Hess declare that they did not deny

5

Banks recreation. (Id. at ¶ 70.) Upon his release from the SHU, he did not seek medical attention for any adverse conditions attributable to a lack of recreation. (Id. at ¶ 71.) On May 10, 2006, he was given a physical and no muscular atrophy was present. (Id. at ¶ 72.)

### 3. *Inadequate Medical Care*

Bender and Hess are not medical professionals and were not responsible for providing medical care to inmates. (Id. at ¶ 57.) Medical staff make rounds in the SHU on a daily basis and at no time did Banks make a request to Bender or Hess to be seen by medical staff. (Id. at ¶ 58.) If Banks or any other SHU inmate had an "emergency," Bender and Hess would have requested assistance and contacted the appropriate staff to handle the situation. (Id. at ¶ 61.) Banks allegedly sought, and was denied, emergency assistance on two occasions. However, he is unaware whether Bender or Hess was working at the time. (Id. at ¶ 62.)

Banks did not seek medical attention upon his release from the SHU. (Id. at ¶ 63.) He was given a routine physical on May 10, 2006, and found to be "essentially healthy." (Id. at 65.) On June 12, 2006, he complained of lower back pain and was diagnosed as having a muscle strain. (Id. at ¶ 66.) "At no time at the beginning, during or at the conclusion of his stay at USP Canaan did Banks complain, demonstrate or otherwise indicate to medical personnel that he suffered from hypertension, mental anguish, difficulty breathing, choking, muscle atrophy or muscle pain outside of once [sic] instance of lower back pain that he attributed to

6

scoliosis of the spine, a condition that he was diagnosed with prior to entering prison." (Id. at ¶ 67.)

## II. Standard of Review

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality. See FED. R. CIV. P. 56(c). The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e). Only if this threshold is met may the cause of action proceed. Pappas, 331 F. Supp. 2d at 315.

## III. Discussion

### A. First Amendment

The First Amendment offers protection for a wide variety of expressive activities. See U.S. Const. amend I. These rights are lessened, but not extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct. See Turner v. Safley, 482 U.S. 78, 89 (1987). Retaliation for expressive activities can infringe upon an individual's

rights under the First Amendment.  See Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000).  To prevail on a retaliation claim under 42 U.S.C. § 1983, plaintiff must demonstrate (1) that he was engaged in protected activity; (2) that he suffered an "adverse action" by government officials; and (3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him."  Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001) (quoting Allah, 229 F.3d at 225).

Banks alleges that defendant Lappin instituted a "de facto policy" of retaliation "to punish inmates including Banks who file or attempt to file grievances."  (Doc. 38, at ¶ 9.)  There is simply no evidence that such a policy exists.  Banks' testified as follows:

> Q. How did you find out about this policy?
>
> A. From talking to other inmates and from seeing what happened to me.
>
> Q. So from your personal experience you infer that there is a policy.  And then what other inmates did you talk to?
>
> A. Various inmates at various places.
>
> Q. Do you remember who?
>
> A. Sam Cornish is one.  Same thing happened to him. And I'm going to have him as a witness.
>
> Q. Okay.  What other inmates?
>
> A. I can't remember their names.
>
> Q. And what - -

A. I did talk to Mr. Lappin himself. I don't know if you're aware of that. He came here.

Q. We'll get to that in just a moment. What is it that other inmates said to you that proved to you that there was a de facto policy?

A. Same thing happened to me happened to them. They were at a camp, something gets alleged. Next thing you know they up your custody, and they send them - - send them somewhere. For a bogus - - I mean, nothing major. . . .

Q. Do you believe this policy is written down anywhere?

A. No, I highly doubt if it's written down. I[t] might be, though. In a memorandum somewhere.

Q. Now you talked about having a discussion with Director Lappin at some point. Tell me about that.

A. He came down here - - I can't remember exactly when it was, but - -

Q. Here meaning Yazoo City?

A. Yes. And I got a chance to speak with him. And from our discussion I believe that he created a de facto policy.

Q. Well, what about that discussion indicated that to you?

A. He just confirmed what I'm alleging. I mean, he said, you know, "we can ship you anywhere at any time for any reason. We don't need for you to have an incident. It's at our discretion."

Q. Okay.

A. So there's a policy. He's telling them they can do whatever. . . .

9

> \* \* \*
>
> Q. Do you know if Mr. Lappin at any time specifically instructed the other defendants in this case to act against you in any way?
>
> A. I believe he did.
>
> Q. Okay. What's the basis of that?
>
> A. The basis of that is Nicklin told me, "Anything I do comes from the top."
>
> \* \* \*
>
> Q. I'm trying to get at if you have any evidence that Defendant Lappin specifically instructed any of the other defendants to act against you individually.
>
> A. Yes. From what - - like I said, what Nicklin told me. And then when I got a chance to talk to him his answer was - - Nicklin said it. "Anything I do comes from the top." So to me, that tells me that the top is Harley [sic] Lappin of the BOP. Unless she meant the president.

(Doc. 124-5, at 67-72.) Banks' allegations are bald conclusions and lack any record support. Indeed, this claim is essentially based upon Banks' feelings or intuition. Without substantive support in the record, this claim cannot survive summary judgment. Accordingly, the court finds that Banks has failed to establish the existence of a de facto policy of retaliation and the court will enter judgment in favor of defendants on this claim.

**B. Fourth Amendment**

In the instant matter, Banks alleges that his expectation of privacy was infringed upon when defendants read his legal mail. Unlawful search claims require proof of an unconstitutional invasion of a plaintiff's "reasonable expectation of privacy" or a deprivation of his or her interest in property. See Soldal v. Cook County, 506 U.S. 56, 62-64 (1992); Rakas v. Illinois, 439 U.S. 128, 133-35 (1978) (citing Alderman v. United States, 394 U.S. 165, 174 (1969)). In the prison setting, an inmate's reasonable expectation of privacy "necessarily is of diminished scope." See United States v. Solomon, No. 05-385, 2007 WL 1099097, at *3 (W.D. Pa. 2007) (citing Bell v. Wolfish, 441 U.S. 520, 557 (1979)). For instance, numerous circuit courts have held that prison officials do not violate an inmate's Fourth Amendment rights when they inspect an inmate's mail. See Bates v. MHM Corr. Servs., No. 05-2285, 2008 WL 396225, at *5 (M.D. Pa. Feb. 11, 2008) (citing Stow v. Grimaldi, 993 F.2d 1002, 1004-05 (1st Cir. 1993) (holding that a prison practice of requiring non-privileged outgoing mail to be submitted for inspection in unsealed envelopes did not violate prisoners' constitutional rights); Smith v. Delo, 995 F.2d 827, 830 (8th Cir. 1993) (stating that prison officials are justified in screening outgoing nonlegal mail for escape plans, contraband, threats, or evidence of illegal activity); United States v. Whalen, 940 F.2d 1027, 1034-35 (1991) (holding that because prison officials are permitted to examine inmate mail to ensure that the mail does not interfere with the orderly running of the prison, contain threats, or facilitate criminal activity, there is no expectation of privacy in mail that inmates are required to leave

11

unsealed); United States v. Kelton, 791 F.2d 101, 103 (8th Cir. 1986) (stating that a prisoner's Fourth Amendment rights were not violated when prison official inspected and copied prisoner's outgoing mail); Smith v. Shimp, 562 F.2d 423, 426-27 (7th Cir. 1977) (reasoning that when a pretrial detainee sends non-privileged mail, he knowingly exposes same to possible inspection by jail officials and consequently yields to reasonable search and seizure); United States v. Baumgarten, 517 F.2d 1020, 1028 (8th Cir. 1975) (holding that, under circumstances where prisoner knew of official policy of reading prisoners' outgoing and unsealed mail, prisoner cannot say the state gained access to contents of a letter by unlawful search and seizure)).

Defendants declare that they did not open, read or copy inmate outgoing or incoming mail or improperly handle properly marked "special mail." (Id. at ¶¶ 44, 47.) Defendants also point out that institutional policies codified at 28 C.F.R. § 540.14 govern the inspection of mail and that Banks has "provided no evidence that [the mail at issue] was marked as legal mail as required by 28 C.F.R. § 540.19, and he has provided no evidence that it was not treated in accordance with 28 C.F.R. § 540.18 by the named defendants (as opposed to someone else.)" (Doc. 124, at 38.)

In opposition, Banks argues that an alleged admission by defendants, that they inspected and read his mail, is sufficient to withstand summary judgment. He is mistaken. Unlawful search claims require proof of an unconstitutional invasion of a plaintiff's reasonable expectation of privacy and turn on facts such as: (1) the existence of an institutional policy informing inmates that their mail will be

12

inspected, (2) whether the mail was nonlegal and/or non-privileged, (3) whether the mail was sealed or unsealed, and (4) whether the mail was incoming or outgoing. In the face of declarations by defendants that they did not read, open, or copy his legal mail, and that there existed an institutional policy that governed the practice of opening mail, the burden of proof shifts to Banks to come forth with affirmative evidence, beyond the allegations of the pleadings, in support of his right to relief. No such proof has been submitted by Banks. Defendants' motion for summary judgment will be granted on the Fourth Amendment claim.

### C. Eighth Amendment

To state a claim under the Eighth Amendment, an inmate must allege both an objective and subjective component. See Wilson v. Seiter, 501 U.S. 294, 298 (1991). The objective component mandates that "only those deprivations denying 'the minimal civilized measure of life's necessities' . . . are sufficiently grave to form the basis of an Eighth Amendment violation." Id. (quoting Rhodes v. Chapman, 452 U.S. 337, 346 (1981)). This component requires that the deprivation sustained be sufficiently serious, for only "extreme deprivations" are sufficient to make out an Eighth Amendment claim. See Hudson v. McMillian, 503 U.S. 1, 9 (1992).

The subjective component requires that the state actor possess a particular state of mind because only the "unnecessary and wanton infliction of pain" implicates the Eighth Amendment. See Wilson, 501 U.S. at 297. The test used in determining whether the state actor possessed the requisite state of mind is whether the prison official's actions were "deliberately indifferent." See id. at 303.

Deliberate indifference is more than a mere lack of ordinary due care; it is a state of mind equivalent to a reckless disregard of a known risk of harm. See Farmer v. Brennan, 511 U.S. 825, 834 (1994). To establish deliberate indifference, an inmate must show that a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 847.

      1.      Inadequate Cell Conditions

The Eighth Amendment does not mandate that prisons be free of discomfort. Hudson, 503 U.S. at 9. Rather, a prisoner must show that he has been deprived of "the minimal civilized measure of life's necessities," such as food, clothing, shelter, sanitation, medical care, or personal safety. Farmer, 511 U.S. at 834 (citations omitted). To violate the Eighth Amendment, conditions of confinement must be dangerous, intolerable or shockingly substandard. Riley v. Jeffes, 777 F.2d 143, 147 (3d Cir. 1985); Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 757 (3d Cir. 1979).

Banks alleges that his cell was filled with dust and mites from the air vent which was never cleaned. (Doc. 38, at ¶ 27.) Contrary to Banks' assertion, the air ventilation system was regularly maintained by the Mechanical Services Department. The record is completely devoid of evidence that would establish that the air quality in the SHU resulted in conditions of confinement that could be

14

described as dangerous, intolerable or shockingly substandard.[4] The record lacks any reliable support for Banks' allegations and is devoid of corroborative evidence for his conclusory allegations. In the absence of any reasonable proof of this claim, summary disposition is warranted.

2. Deprivation of Recreation

Recreation is "extremely important to the psychological and physical well-being of the inmates." Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979); Peterkin v. Jeffes, 855 F.2d 1021, 1031 (3d Cir. 1988); see Keenan v. Hall, 83 F.3d 1083, 1089 (9th Cir. 1996)("[d]eprivation of outdoor exercise violates the Eighth Amendment rights of inmates confined to continuous and long-term segregation"); Patterson v. Mintzes, 717 F.2d 284, 289 (6th Cir. 1983); Loe v. Wilkinson, 604 F.

---

[4] Eighth Amendment violations typically require the presence of intolerable conditions, far worse than those alleged by Banks. See, e.g. McKeithan v. Beard, 322 Fed. App'x. 194, 202 (3d Cir. 2009) (finding objective component of Eighth Amendment claim met where plaintiff was housed next to psychotic inmates who smeared themselves with feces and stood at their cell doors, placed feces in air vents, flooded tier with waste, and banged endlessly on sinks) (citing Vinning-El v. Long, 482 F.3d 923, 925 (7th Cir. 2007) (recognizing claim where plaintiff described floor covered with water, a broken toilet, feces and blood smeared on the wall, and no mattress); and McBride v. Deer, 240 F.3d 1287, 1292 (10th Cir. 2001) (upholding Eighth Amendment claim where inmate was forced to remain in feces-covered cell for three days)); DeSpain v. Uphoff, 264 F.3d 965 (10th Cir. 2001) (finding violation of Eighth Amendment where, for thirty-six hours, water overflow after riot flooded unit to standing depth of four inches, prisoners urinated into the water in which feces and uneaten food floated, water was nearly even with bottom of food carts, toilets would not flush, and inmate was afraid to eat); McCord v. Maggio, 927 F.2d 844, 848 (5th Cir. 1991) (finding Eighth Amendment violation where prisoner was forced to live and sleep for two years in unlit cell with sewage back up and roach infestation),

Supp. 130, 135 (M.D. Pa. 1984). Although exercise is "one of the basic human necessities protected by the Eighth Amendment," LeMaire v. Maass, 12 F.3d 1444, 1457 (9th Cir. 1993), a temporary denial of exercise with no medical effects is not a substantial deprivation. May v. Baldwin, 109 F.3d 557, 565 (9th Cir. 1997) (determining that the denial of recreation for twenty-one days was insufficient to sustain an Eighth Amendment claim); Knight v. Armontrout, 878 F.2d 1093, 1096 (8th Cir. 1989) (finding that the denial of recreation for thirteen days does not amount to cruel and unusual punishment); French v. Owens, 777 F.2d 1250, 1255 (7th Cir. 1985) (pointing out that lack of exercise may rise to a constitutional violation only if the deprivation is such that "movement is denied [to such extent that] muscles are allowed to atrophy [and] the health of the individual is threatened").

Banks' alleged deprivation was short-term—16 days. Banks admits that he received adequate recreation time immediately after his release from the SHU. (Doc. 124-5, p. 26). Moreover, it is undisputed that Banks did not suffer any adverse medical effects from the alleged deprivation of recreation. He was examined by medical staff who observed no atrophy of muscles or evidence of physical harm from lack of exercise. Consequently, defendants are entitled to an entry of summary judgment on this claim.

16

### 3. Inadequate Medical Care

To demonstrate a prima facie case of Eighth Amendment cruel and unusual punishment based on the denial of medical care, as is alleged here, a plaintiff must establish that defendants acted "with deliberate indifference to his or her serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976); Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993). This standard is obviously met when pain is intentionally inflicted on a prisoner, when the denial of reasonable requests for medical treatment exposes the inmate to undue suffering or the threat of tangible residual injury, or when, despite a clear need for medical care, there is an intentional refusal to provide that care. See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) (quoting White v. Napoleon, 897 F.2d 103, 109 (1990); Monmouth Cnty. Corr. Inst. Inmates v. Lensario, 834 F.2d 326, 346 (3d Cir. 1987). A prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference, and "mere disagreements over medical judgment do not state Eighth Amendment claims." White, 897 F.2d at 110.

There is no evidence that Banks suffered from a serious medical need or experienced a medical emergency while housed in the SHU. There is no evidence that Bender and Hess were aware that Banks suffered from a serious medical need, or had a medical emergency, while housed in the SHU. Nor is there any evidence that Banks was clearly in need of medical care or repeatedly requested medical attention and that Bender and Hess intentionally ignored him. Further, beyond referencing the entire sixteen-day SHU confinement, Banks fails to specify the

17

dates of the medical emergencies or the dates that the resulting deprivations occurred, which makes it impossible to determine whether defendants were even working when the alleged incidents took place. Banks has failed to meet his burden. Consequently, summary judgment will be entered in favor of defendants Bender and Hess on the Eighth Amendment denial of medical care claim.

## IV. Conclusion

Based on the foregoing, defendants' motion for summary judgment will be granted. An appropriate order follows.

     S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:      February 1, 2011

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FREDERICK BANKS,** | : | **CIVIL ACTION NO. 1:06-CV-1127** |
| Plaintiff | : | (Judge Conner) |
| v. | : | |
| **JULIE NICLKIN, et al.,** | : | |
| Defendants | : | |

## ORDER

AND NOW, this 1st day of February, 2011, upon consideration of defendants' motion (Doc. 117) for summary judgment, and in accordance with the foregoing memorandum, it is hereby ORDERED that:

1. Defendants' motion for summary judgment (Doc. 117) is GRANTED.

2. The Clerk of Court is directed to ENTER judgment in favor of defendants Lappin, Lindsey, Renda, Nicklin, Roberts, Bender and Hess and against plaintiff.

3. The Clerk of Court is directed to ENTER judgment in accordance with all prior orders of court (See Doc. 78, at 17; Doc. 59, at 38) in favor of defendants and against plaintiff.

4. The Clerk of Court is further directed to CLOSE this case.

5. Any appeal from this order is DEEMED frivolous and not in good faith. See 28 U.S.C. § 1915(a)(3).

    S/ Christopher C. Conner
    CHRISTOPHER C. CONNER
    United States District Judge